# THE WORLD FUEL SERVICES CORPORATION MARINE GROUP OF COMPANIES

## GENERAL TERMS AND CONDITIONS

Effective April 1, 2010, the following terms of sale and supply shall constitute the General Terms and Conditions ("General Terms") of the World Fuel Services Corporation Marine Group of companies (collectively, "World Fuel Services") headquartered at 9800 N.W. 41st Street, Suite 400, Miami, Florida 33178, which includes, but is not limited to, World Fuel Services, Inc.; World Fuel Services Europe, Ltd.; World Fuel Services (Singapore) Pte. Ltd.; World Fuel Services (Denmark) ApS; Tramp Oil Germany GmbH & Co KG; Tramp Oil (Brasil) Ltda.; Tramp Oil and Marine (Chile) S.A.; Henty Oil Limited; Falmouth Petroleum Limited; Trans-Tec International S.R.L.; Casa Petro S.R.L.; Marine Energy Arabia Co, LLC; and their respective trade names, subsidiaries, affiliates and branch offices. This list includes all subsidiaries of World Fuel Services Corporation who have sold, are selling or will sell marine petroleum products and services, whether or not in existence on the effective date.

Unless otherwise agreed in writing, the General Terms shall apply to every sale of marine petroleum products ("Products") entered into between any World Fuel Services entity as seller ("Seller"), and any buyer ("Buyer") of such Products.

1.  **INCORPORATION AND MERGER:** Each sale of Products shall be confirmed by e-mail, fax or other writing from the Seller to the Buyer ("Confirmation"). The Confirmation shall incorporate the General Terms by reference so that the General Terms thereby supplement and are made part of the particular terms set forth in the Confirmation. The Confirmation and the General Terms shall together constitute the complete and exclusive agreement governing the transaction in question (the "Transaction"). No other prior agreements or understandings, whether verbal or written, shall apply unless specifically referenced in the Confirmation. In the event of an inconsistency between the particular terms of the Confirmation and the General Terms, the Confirmation shall control for the purpose of that particular Transaction with the exception of Sections 8 and 17 below, which can only be modified by a mutually signed writing between Buyer and Seller.

2.  **PRICES:** The price to be paid for Products sold in each Transaction shall be as agreed between the Buyer and Seller in the Confirmation. Unless otherwise specified, the quoted price term shall be ex-wharf and shall represent only the purchase price of the Products. If the price term is quoted as "delivered", then in addition to the purchase price of the Products, the price shall include only the cost of transportation. The Buyer shall pay any additional expenses or costs such as barging, demurrage, wharfage, port dues, duties, taxes, fees and any other costs including, without limitation, those imposed by governmental authorities. Seller reserves the right, upon notification to Buyer, to adjust the price after Confirmation in order to reflect any unanticipated increase in costs to Seller incurred after issuance of the Confirmation. If

625201-2


EXHIBIT 5

Buyer does not accept such adjustment, the delivery shall be cancelled without liability to either party.

3. **QUALITY:** Unless otherwise specified in the Confirmation, the Products shall be of the quality generally offered by the Seller at the time and place of delivery, for the particular grade or grades ordered by the Buyer. Should the Confirmation guarantee a particular specification, the analysis of any test results shall make allowances for generally recognized industry standards of repeatability and reproducibility. All grades of produce may contain petroleum industry allowed, bio-derived components. Where specifications designate a maximum value, no minimum value is guaranteed unless expressly stated in the Confirmation. Conversely, where minimum values are provided in a specification, no maximum values are guaranteed unless expressly stated in the Confirmation. Buyer shall have the sole responsibility for the selection of proper Products for use in the vessel being supplied ("Receiving Vessel") or other receiving facility. **ANY IMPLIED CONDITIONS AND WARRANTIES, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, ARE EXPRESSLY EXCLUDED AND DISCLAIMED.**

4. **QUANTITY:** The quantity of Products sold in each Transaction shall be as agreed between the Buyer and the Seller as per the Confirmation. Notwithstanding acceptance of the Buyer's order, the Seller's obligation to supply such quantities shall be subject to availability of Products from the Seller's source of supply at the time and place delivery is requested. Actual quantity delivered may vary in accordance with normal operational tolerances of delivery equipment.

5. **TITLE:** Delivery shall be deemed completed and title and risk of loss shall pass to the Buyer when the Marine Fuel reaches the physical supplier's end of the delivery hose or pipeline connecting Physical Supplier's delivery facilities to the Receiving Vessel's receiving facilities, or in the event that Buyer has arranged its own transportation, the receiving facilities of the barge or coastal tanker nominated by Buyer. The Buyer shall be responsible for connection to the permanent intake of the Receiving Vessel, or the barge or coastal tanker nominated, and pumping shall be performed under the direction and responsibility of the Buyer.

6. **MEASUREMENT, TESTING, CLAIMS:**

    (a) The quantity of product delivered shall be conclusively determined from the official gauge or meter of the bunkering barge or tank truck effecting delivery. However, in those ports where legal requirement or industry practice dictate that quantities are measured by referencing either shore tank figures or barge loading figures, such measurements shall instead be conclusive. In cases of delivery ex-wharf, shore-tank figures shall be conclusive. Quantities calculated from the Receiving Vessel's soundings shall not be considered. Quantity claims are waived by Buyer unless expressly noted in writing on the Bunker Delivery Receipt ("BDR") at the time of delivery or, in ports where such notation on the

-2-

625201-2

BDR is not permitted, must be presented at the time of delivery to the physical supplier's personnel in a separate Letter of Protest.

(b) With respect to the quality of the Products supplied, samples shall be drawn at the time of delivery. The method of sampling will be governed by local regulation, if such exists, otherwise as per the method used by the local physical supplier. These samples shall be conclusively deemed to be representative of the quality of the Products supplied to the Receiving Vessel. In the event of a claim by the Buyer, the sample(s) shall be tested and analyzed by an independent surveyor whose results shall be conclusive and binding on both Buyer and Seller. The independent surveyor shall be appointed by mutual agreement, and the surveyor's fee shall be shared equally by the Buyer and Seller. In the event that Seller proposes an independent inspector and Buyer takes no action to either accept this proposal or to suggest an alternative inspector, then Seller's choice of inspector shall be binding and any tests performed by such inspector's lab shall be similarly binding, regardless of whether or not Buyer chooses to send a representative to such testing.

(c) Any samples drawn by Buyer's personnel either at the time of bunkering or at any date after bunkering shall not be valid as an indicator of the quality supplied. The fact that such samples may bear the signature of personnel aboard the delivery conveyance shall have no legal significance as these local personnel have no authority to bind Seller to different contractual terms. Seller shall have no liability for any claims arising in circumstances where Buyer has commingled the Products on board the vessel with other fuels.

(d) The Buyer waives any claim against the Seller with respect to the quantity or quality of the Products supplied unless the Buyer's claim is submitted to the Seller in writing within seven (7) days after the date of delivery of the Products. However, in the event that the physical supplier grants to Seller a period longer than seven (7) days in the physical supplier's own terms and conditions, then this same period will be extended from Seller to Buyer. In any event, should any timely claim submitted by Buyer not be settled to Buyer's satisfaction in a commercial manner, any legal action by Buyer thereon shall be formally waived and time barred unless commenced under Clause 17 (Law and Jurisdiction) within 6 months of the delivery date or, in claims related to non-delivery, within 6 months of the scheduled delivery date.

(e) If Buyer submits a claim against the Seller with respect to the quantity or quality of the Products supplied, the Seller shall be entitled and the Buyer shall allow, or where the Buyer has chartered the vessel, shall obtain authorization from the Owner to allow, the Seller to board the Vessel and investigate the vessel's records and to make copies of documents which the Seller may consider necessary for its investigations. Failure to allow boarding and/or to produce copies of documents shall constitute a waiver of the Buyer's claim.

625201-2

(f)  It is the duty of the Buyer to take all reasonable actions to eliminate or minimize any damages or costs associated with any off-specification or suspected off-specification Products. To this end Buyer shall cooperate with the Seller in achieving the most cost effective solution including the consumption of the Product after treatment and/or special handling. In the event that the Product is off-specification and cannot be consumed by the vessel, Buyer's remedies shall be limited exclusively and solely to replacement of the nonconforming products. If Buyer removes Product without the express written consent of Seller, then all such removal and related costs shall be solely for Buyer's account. **IN ANY EVENT, SELLER'S LIABILITY HEREUNDER FOR ANY CLAIMS, WHETHER ARISING FROM QUALITY, QUANTITY, ACCIDENT, DELAY, SPILL OR OTHER CAUSE, SHALL NOT EXCEED THE PRICE OF THAT PORTION OF THE PRODUCT SOLD HEREUNDER ON WHICH LIABILITY IS ASSERTED. FURTHERMORE, NO LIABILITY WILL BORNE BY SELLER FOR (1) ANY DEMURRAGE OR OTHER VESSEL DELAY OR FOR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, DAMAGES ARISING FROM THE EXERCISE OF SELLER'S RIGHT TO SUSPEND AND/OR TERMINATE DELIVERY OF PRODUCT, OR (2) ANY ACTS OR OMISSIONS OF AGENTS AND/OR SUBCONTRACTORS OF SELLER, INCLUDING, WITHOUT LIMITATION, FUEL TRANSPORTERS OR FUELING AGENTS.**

7.  **PAYMENT:**

   (a)  Unless otherwise provided in the Confirmation, all sales shall be on a cash in advance or irrevocable letter of credit basis. All letters of credit procured by Buyer in favor of Seller shall be in a form and substance acceptable to Seller and issued only by a bank acceptable to Seller.

   (b)  Any individual bunker transaction not requiring cash in advance shall require credit approval by Seller's Credit Department in Miami, Florida. This approval, which will occur prior to Seller's transmittal to Buyer of a Confirmation, shall be construed as the binding act in a bunker transaction and it is agreed that contract formation has occurred in Florida. If payment of cash in advance is not required, the Buyer shall make payment in full on or before the due date set forth in the invoice, in immediately available U.S. dollars and in such manner as the Seller may designate in the invoice, without discount, set-off, or deduction. Invoices may be sent via fax, e-mail or any other means permitted by law. In the event that delivery documents are not available, Seller may invoice based on email or facsimile advice of delivery details in lieu of delivery documents. Notwithstanding any disputes regarding quality, quantity, or other matter, the Buyer must initially pay the full amount due, and any disputes shall be resolved between the Buyer and the Seller after such payment has been made. Failure

        by Buyer to pay the full amount when due shall constitute a waiver of any claims by Buyer.

(c)     Past due amounts shall accrue interest at a rate equal to the lesser of 2.0 percent per month, or the maximum rate permitted by applicable law. All amounts more than 15 days past due shall incur an additional 5% administrative fee. All payments received from Buyer after an invoice is overdue shall first be applied to interest, legal collection costs and administrative fees incurred before they will be applied to the principal amounts on a subsequent delivery. Buyer may not designate application of funds to a newer invoice so long as there are any unpaid charges, interest, collection costs or administrative fees on a previous one. This shall not be construed, however, as preventing Seller's option to choose application of funds in instances where subsection (h) below shall apply. Any waiver by Seller of interest charges or administrative fees on a particular invoice shall not be construed as a waiver by Seller of its right to impose such charges on subsequent deliveries.

(d)     If the payment due date falls on a weekend or any bank holiday in the country where payment is to be remitted (other than a Monday), payment must be made on the first prior available banking day. If the payment due date falls on a Monday bank holiday, payment may be made on the next available banking day.

(e)     The Buyer and the Seller are responsible for their respective banking charges.

(f)     The Buyer agrees to pay, in addition to other charges contained herein, internal and external attorneys fees on a full indemnity basis for the Seller's collection of any non-payment or underpayment as well as any other charges incurred by the Seller in such collection including, but not limited to, the cost of bonds, fees, internal and external attorneys fees associated with enforcing a maritime lien, attachment or other available right, whether in law, equity or otherwise.

(g)     All unpaid invoices from Seller to Buyer shall immediately be considered overdue, upon the occurrence of any of the following events: (i) any invoice of Seller to Buyer is seven (7) days overdue; (ii) any vessel owned or operated by Buyer is arrested or attached by Seller or a third party for unpaid debts; or (iii) there is a change in the financial circumstances or structural organization of Buyer sufficient to cause Seller to reasonably believe that its likelihood of receiving payment from the Buyer is jeopardized or that its security interest in any of Buyer's owned or operated vessels is jeopardized.

(h)     In the event that more than one invoice is past due at the same time, Seller shall be entitled, at its sole discretion, to specify the particular invoice to which any subsequent payments shall be applied.

(i) Seller reserves the right, in addition to all other rights and remedies available to it under applicable law, in equity, or otherwise, to suspend further deliveries of Product, and demand payment of all outstanding balances, if the outstanding balances due from Buyer (including estimates of unbilled sales) exceed the Buyer's applicable credit limit, or if Buyer fails to make any payment as herein provided or otherwise defaults under the General Terms.

8. **CREDIT AND SECURITY:**

   (a) Products supplied in each Transaction are sold and effected on the credit of the Receiving Vessel, as well as on the promise of the Buyer to pay, and it is agreed and the Buyer warrants that the Seller will have and may assert a maritime lien against the Receiving Vessel for the amount due for the Products delivered. This maritime lien shall extend to the vessel's freight payments for that particular voyage during which the bunkers were supplied and to freights on all subsequent voyages. Disclaimer of lien stamps placed on a Bunker Delivery Receipt shall have no effect towards the waiver of such lien.

   (b) In the event of a breach of the warranty set forth in sub-paragraph (a) above before delivery, the Seller shall be entitled to terminate the Transaction. Further, the Seller reserves the right to impose a cancellation fee in the amount set forth in Section 10 below.

   (c) If the purchase of Products is contracted for by an agent, then such agent, as well as the principal, shall be bound by and be fully liable for obligations of the Buyer in the Transaction, whether such principal be disclosed or undisclosed.

   (d) All sales made under these terms and conditions are made to the registered owner of the vessel, in addition to any other parties that may be listed as Buyer in the confirmation. Any bunkers ordered by an agent, management company, charterer, broker or any other party are ordered on behalf of the registered owner and the registered owner is liable as a principal for payment of the bunker invoice.

9. **DELIVERIES:**

   (a) The Buyer shall give the Seller's local representative at the port of supply at least 48 hours written notice of the scheduled time of delivery, excluding Sundays and holidays.

   (b) In the event that delivery is desired outside normal working hours and is permitted by port regulations, the Buyer shall pay all overtime and additional expenses incurred in connection therewith.

(c) Buyer shall provide free of cost a clear safe berth, position or anchorage alongside the vessel receiving lines. Seller shall be under no obligation to make deliveries when in its sole opinion a clear and safe berth, position or anchorage is not available. The Buyer shall make all connections and disconnections of the delivery hose to the Receiving Vessel or barge or coastal tanker nominated on behalf of the Buyer and shall render all other necessary assistance and equipment to promptly receive the Products.

(d) Seller shall use due diligence in the timely delivery of Product to Buyer's vessels. However, Seller shall not be liable for any delays due to congestion at the loading terminal, prior commitments of available barges/trucks, or discretionary decisions of the local transportation provider as to the vessel's order of placement in the daily barge program. In the case of delays not caused by the above circumstances, and which can be attributed to the negligence of Seller, Seller will reimburse Buyer for extra port costs such as shifting, pilotage and berthing. However, under no circumstances will Seller be liable for costs of ship's demurrage, off-charterhire or for indirect, special, incidental other consequential damages. If the actual delivery date is later than the contracted date stated in the Confirmation, the price may be subject to price fluctuations up to time of delivery, at the Seller's discretion. If the Receiving Vessel shall not have arrived within five (5) days after the expected date of arrival, the Seller shall have the right, at its sole discretion, to cancel the Transaction without prejudice to any other rights the Seller may have.

(e) The Seller shall be at liberty to make arrangements with other companies ("Suppliers") to supply the whole or any part of the Products sold in each Transaction.

(f) The Buyer shall be responsible for all demurrage or additional expenses incurred by the Seller if the Buyer, its vessel or its port agent causes delay to the barge, truck or delivery facilities. The Buyer shall also pay any charges for mooring, unmooring and port dues, if incurred. In addition, the Buyer shall be liable for any expenses incurred by the Seller resulting from the Buyer's failure to accept the full quantity of Products ordered by the Buyer.

10. **CANCELLATION CLAUSE:** If subsequent to the Confirmation, the Buyer cancels the order for any reason whatsoever, including circumstances entirely outside of Buyer's control, then Seller without prejudice to any other rights it may have, shall be entitled to recover a) any cancellation fees imposed by the physical supplier; b) any difference between the contract price of the undelivered product and the amount received by the Seller upon resale to another party (or, if another buyer cannot be found, any market dimunition in the value of the product as reasonably determined from available market indexes); and c) all costs and damages arising from any underlying physical or derivative paper contracts which Seller has entered into in order to effect supply.

-7-

625201-2

11. **INDEMNITY:** The Buyer shall defend, indemnify and hold the Seller harmless with respect to any and all liability, loss, claims, expenses, or damage the Seller may suffer or incur by reason of, or in any way connected with, the acts, omissions, fault or default of the Buyer or its agents in the purchase, receipt, use, storage, handling or transportation of the Products in connection with each Transaction.

12. **CONTINGENCIES:**

    (a) The Seller shall not be in breach of its obligations under any Transaction in the event that performance is prevented, delayed, or made substantially more expensive as a result of any one or more of the following contingencies, whether or not such contingency may have been foreseen or foreseeable at the time of contracting and regardless of whether such contingency is direct or indirect:

    (i) labor disturbance, whether involving the employees of the Seller, Supplier or otherwise, and regardless of whether the disturbance could be settled by acceding to the demands of the labor group;

    (ii) compliance with applicable law or a change, request or order of any governmental authority or agent;

    (iii) shortage in raw material, transportation, manufacturing, or fuels from the Seller's contemplated source of supply, not shown by the Buyer to be due to the Seller's lack of diligence; or

    (iv) any cause beyond the reasonable control of the Seller, whether or not foreseeable.

    (v) any determination, at Seller's sole discretion, that proceeding with a delivery would be a violation of the sanctions laws or regulations of the United States or any other jurisdiction to which Seller may be subject.

    (b) In the event that performance is prevented or delayed by such a contingency, the Seller may reduce deliveries in any manner as it may determine in its sole discretion.

    (c) If performance is made substantially more expensive by such a contingency, the Seller shall have the option either to reduce or stop deliveries or to continue deliveries and increase prices in fair proportion to the increased cost of operation under such a contingency.

    (d) The Seller shall not be liable for demurrage or delay resulting from such a contingency.

(e) Quantities not sold or purchased due to the occurrence of such a contingency may be reduced or eliminated from the contractual amount at the discretion of the Seller.

(f) Nothing in this provision shall be deemed to excuse the Buyer from its obligation to make payments for Products received.

13. **TAXES AND ASSESSMENTS:**

(a) The Buyer will pay the Seller the amount of all excise, gross receipts, import, motor fuel, superfund and spill taxes, and all other federal, state and local taxes (collectively, "Taxes and Assessments") or the foreign equivalent as determined in the sole, absolute and unfettered discretion of Seller (other than taxes on income), and paid or incurred by the Seller directly or indirectly with respect to the Products and/or on the value thereof insofar as the same are not expressly included in the price quoted. Any additional Taxes and Assessments incurred by Seller arising from a Transaction and imposed by any governmental and/or any regulatory authority after delivery as a result of an audit, whether domestic and/or international, shall be borne solely by Buyer.

(b) The Buyer will present the Seller with any required documentation, including but not limited to registrations, exemptions, certifications, claims, refunds, declarations or otherwise, in a form and format, and on or before whatever due date the Seller shall require, to satisfy the Seller's concerns in connection with any of the above taxes or assessments. Further, the Buyer shall indemnify and hold the Seller harmless for any damages, claims, liability or expense the Seller might incur due to the Buyer's failure to comply with this requirement.

14. **SAFETY AND ENVIRONMENTAL PROTECTION:**

(a) It shall be the sole responsibility of the Buyer to comply and advise its personnel, agents and/or customers to comply, both during and after delivery, with all the health and safety requirements applicable to the Products and to ensure so far as possible that any user of such Products avoids without limitation any frequent or prolonged skin contact with the Products. The Seller accepts no responsibility for any consequences arising from failure to comply with such health and safety requirements or arising from such contact. The Buyer shall protect, indemnify and hold the Seller harmless against any damages, expense, claims or liability incurred as a result of the Buyer, or any user of the Products, or its customers failing to comply with the relevant health and safety requirements.

(b) In the event of a spill or discharge occurring before, during or after bunkering, the Buyer shall immediately notify the appropriate governmental authorities and

       take whatever action is necessary, and pay all costs to effect the clean-up. Failing prompt action, the Buyer authorizes the Seller and Supplier to conduct such clean-up on behalf of the Buyer at the Buyer's risk and expense, and the Buyer shall indemnify and hold the Seller and Supplier harmless against any damages, expense, claims or liability arising out of any such spill or clean-up unless such spill or clean-up shall be proven to be wholly caused by Seller's negligence.

(c)    The Buyer warrants that the Receiving Vessel is in compliance with all governmental trading and pollution regulations. The Receiving Vessel will not be moored at a wharf or alongside other marine loading facilities of the Seller or Supplier unless free of all conditions, deficiencies or defects which might impose hazards in connection with the mooring, unmooring or bunkering of the Receiving Vessel.

15. **ADDITIONAL PROVISIONS:**

(a)    Claims, notices and other communications hereunder shall be in writing and shall be mailed via certified or registered mail or by overnight courier to the attention of the particular Seller in each Transaction at the following address: 9800 N.W. 41st Street, Suite 400, Miami, Florida 33178. Unless otherwise indicated by the Buyer, notices hereunder shall be mailed, faxed and/or e-mailed to the Buyer at the address designated by the Buyer for invoicing. Either the Buyer or the Seller may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it by giving fifteen (15) days prior written notice of its new address to the other party.

(b)    No waiver of any of the provisions of this Agreement shall be effective unless it is in writing and signed by the party against whom it is asserted, and any such waiver shall only be applicable to the specific instance to which it relates and shall not be deemed to be a continuing or future waiver of any breach.

(c)    A failure or delay in exercising any right, power or privilege in respect of the General Terms and Conditions will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(d)    The Buyer shall not assign any right or delegate any obligation arising under a Transaction without the prior written consent of the Seller.

(e) If any part of the General Terms is deemed invalid, all other conditions and provisions hereof shall remain in full force as if the invalid portion had never been part of the original agreement.

(f) The headings used herein are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting the General Terms and Conditions.

(g) Neither the General Terms, nor any Confirmation, shall be altered or amended except by an instrument in writing signed by or on behalf of the Seller. Seller may amend the General Terms from time to time without advance notice to Buyer. Any such amendment shall be effective and apply with respect to all Transactions for which a Confirmation is sent after the effective date of the altered or amended General Terms.

(h) No ambiguity in any provision of the General Terms or any Confirmation shall be construed against a party by reason of the fact it was drafted by such party or its counsel. Acceptance of, or acquiescence in, a course of performance rendered under the General Terms or any Confirmation shall not be relevant or admissible to determine the meaning of the General Terms or any Confirmation, even though the accepting or acquiescing party has knowledge of the nature of the performance and an opportunity to make objection. The General Terms shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, legal representatives, and successors.

16. **WAIVER OF IMMUNITIES:** Buyer expressly and irrevocably waives and agrees not to assert such a defense in any action or proceeding, which may be commenced or asserted against the Buyer or Buyer's revenues and/or assets in connection with a Transaction to the fullest extent permitted by applicable law, with respect to Buyer and Buyer's revenues and/or assets (irrespective of their use or intended use), all immunity on the grounds of sovereign immunity or other similar grounds, where Buyer is a State or Government owned or controlled entity, whether in whole or in part or otherwise, which status would otherwise entitle the Buyer to assert or allege the defense of sovereign immunity in any claim against it from:

(a) Suit;

(b) Jurisdiction of any court;

(c) Relief by way of injunction, order for specific performance or for recovery of property;

(d) Attachment of Buyer's assets (whether before or after judgment); and

(e) Execution or enforcement of any judgment to which Buyer or Buyer's revenues and/or assets might otherwise be entitled in any proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any proceedings.

17. **LAW AND JURISDICTION:** The General Terms and each Transaction shall be governed by the General Maritime Law of the United States and, in the event that the General Maritime Law of the United States is silent on the disputed issue, the law of the State of Florida, without reference to any conflict of laws rules which may result in the application of the laws of another jurisdiction. The General Maritime Law of the United States shall apply with respect to the existence of a maritime lien, regardless of the country in which Seller takes legal action. Any disputes concerning quality or quantity shall only be resolved in a court of competent jurisdiction in Florida. Disputes over payment and collection may be resolved, at Seller's option, in the Florida courts or in the courts of any jurisdiction where either the Receiving Vessel or an asset of the Buyer may be found. Each of the parties hereby irrevocably submits to the jurisdiction of any such court, and irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum or its foreign equivalent to the maintenance of any action in any such court. Seller shall be entitled to assert its rights of lien or attachment or other rights, whether in law, in equity or otherwise, in any country where it finds the vessel. **BUYER AND SELLER WAIVE ANY RIGHT EITHER OF THEM MIGHT HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING FROM OR RELATED TO THE GENERAL TERMS OR ANY TRANSACTION.**

**THE WORLD FUEL SERVICES CORPORATION
MARINE GROUP OF COMPANIES
GENERAL TERMS AND CONDITIONS**

625201-2