

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FILED

APR - 4 2014

CLERK, US DISTRICT COURT
NORFOLK, VA

WORLD FUEL SERVICES TRADING,
DMCC, D/B/A BUNKERFUELS

Plaintiff,

v.

M/V HEBEI SHIJIAZHUANG,
HER ENGINES, TACKLE,
EQUIPMENT, APPURTENANCES,
ETC., IN REM

Defendant,

v.

HEBEI PRINCE SHIPPING COMPANY,
LTD,

Claimant.

Civil Action No. 2:13cv173

## OPINION AND ORDER

This matter is before the Court on a motion for summary judgment filed by plaintiff World Fuel Services Trading, DMCC ("Plaintiff" or "WFS DMCC"), a cross-motion for summary judgment filed by claimant Hebei Prince Shipping Company, Ltd. ("Claimant" or "Prince"), and a motion by Claimant seeking additional discovery pursuant to Fed. R. Civ. P. 56(d). The Court conducted a hearing on the summary judgment motions on March 27, 2014. For the reasons discussed below, Claimant's Rule 56(d) motion is **DISMISSED AS MOOT,** Claimant's cross-motion

for summary judgment is **DENIED**, and Plaintiff's motion seeking summary judgment is **GRANTED**.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. The Fuel Bunker Transaction

Tramp Maritime Enterprises Ltd. ("Tramp"), located in Greece, chartered the M/V HEBEI SHIJIAZHUANG ("the vessel"), registered in Hong Kong, from Claimant, located in China, for three consecutive time charters between May 23, 2012 and November 8, 2012. Bunkerfuels Hellas, located in Athens, Greece, provides marketing and promotion services to Greek vessel operators and owners on behalf of Plaintiff, a bunker fuel provider located in Dubai, United Arab Emirates. Heijmen Decl. ¶¶ 4, 5, 9, ECF No. 48-2. On October 22, 2012, Tramp sent an email to Aristides P. Vogas ("Vogas"), an employee of Bunkerfuels Hellas, for the purpose of obtaining a price quotation for fuel bunkers to be delivered to the vessel on or about October 27, 2012 at the port of Khor Fakkan, United Arab Emirates. Claimant's Ex. 8, ECF No. 39-8. Later that same day, Vogas sent an email to Tramp, confirming the order ("the bunker confirmation"). ECF No. 1-3. The bunker confirmation listed the "buyer" as "MV HEBEI SHIJIAZHUANG and her owners/operators and Tramp Maritime Enterprises Ltd," and the "seller" as "BUNKERFUELS A DBA/DIVISION of WFS Trading DMCC." Id. at 1. The bunker confirmation indicated that the "physical supplier"

2

of the fuel would be APSCO Jeddah ("APSCO"), that the payment terms would be "30 DDD by TTT." Id. Below the details of the transaction was the following language:

> All sales are on the credit of the vsl. Buyer is presumed to have authority to bind the vsl with a maritime lien. Disclaimer stamps placed by vsl on the bunker receipt will have no effect and do not waive the seller's lien. This confirmation is governed by and incorporates by reference seller's general terms and conditions in effect as of the date that this confirmation is issued. These incorporated and referenced terms can be found at www.wfscorp.com. Alternatively, you may inform us if you require a copy and same will be provided to you.

Id.

The website located at www.wfscorp.com is the website for World Fuel Services Corporation ("WFS Corp."), the United States parent corporation of WFS DMCC. A document titled "The World Fuel Services Corporation Marine Group of Companies General Terms and Conditions" is located on the "Marine Solutions" sub-page of WFS Corp.'s website, and can be accessed by clicking the "Marine" menu item at the top of the web page located at www.wfscorp.com and then clicking the "Marine Terms & Conditions" link at the bottom of the web page. The first paragraph of the document states, "the following terms of sale and supply shall constitute the General Terms and Conditions ('General Terms') of the World Fuel Services Corporation Marine Group of companies (collectively, 'World Fuel Services')." ECF No. 30-4 at 1. The document identifies a list of twelve

3

companies comprising the "Marine Group of companies," "which includes, but is not limited to, World Fuel Services, Inc.; World Fuel Services Europe, Ltd.; World Fuel Services (Singapore) Pte. Ltd.; [nine other companies] and their respective trade names, subsidiaries, affiliates and branch offices." Id. The document further provides that the "list includes all subsidiaries of World Fuel Services Corporation who have sold, are selling or will sell petroleum products and services, whether or not in existence on the effective date." Id.

The "Credit and Security" section of the General Terms provides, in pertinent part:

> Products supplied in each Transaction are sold and effected on the credit of the Receiving Vessel, as well as on the promise of the Buyer to pay, and it is agreed and the Buyer warrants that the Seller will have and may assert a maritime lien against the Receiving Vessel for the amount due for the Products delivered. . . . Disclaimer of lien stamps placed on a Bunker Delivery Receipt shall have no effect towards the waiver of such lien.
> . . . .
> All sales made under these terms and conditions are made to the registered owner of the vessel, in addition to any other parties that may be listed as Buyer in the confirmation. Any bunkers ordered by an agent, management company, charterer, broker or any other party are ordered on behalf of the registered owner and the registered owner is liable as a principal for payment of the bunker invoice.

Id. at 6. The document concludes with a "Law and Jurisdiction" paragraph, which provides:

4

> The General Terms and each Transaction shall be governed by the General Maritime Law of the United States and, in the event that the General Maritime Law of the United States is silent on the disputed issue, the law of the State of Florida, without reference to any conflict of laws rules which may result in the application of the laws of another jurisdiction. The General Maritime Law of the United States shall apply with respect to the existence of a maritime lien, regardless of the country in which Seller takes legal action. . . . Seller shall be entitled to assert its rights of lien or attachment or other rights, whether in law, in equity or otherwise, in any country where it finds the vessel.

Id. at 12.

On October 29, 2012, APSCO delivered the bunkers at issue to the vessel in the port of Khor Fakkan and provided the vessel's chief engineer with two "Bunker Delivery Note[s]" reflecting the amount of fuel delivered to the vessel. See ECF Nos. 1-1 and 1-2. The chief engineer signed each Bunker Delivery Note and stamped them with the following "no lien" language: "Bunkering Services and the bunkers are ordered solely for the account of Charterers and not for Owners. Accordingly no lien or other claims whatsoever against the Vessel or her owners can arise." Id.

## B. The Vessel's Arrest

On April 4, 2013, Plaintiff filed a Verified Complaint with this Court, alleging that, "[d]espite repeated demands for payments for the amounts due for the fuel oil and marine gas oil provided, Tramp . . . and the [vessel] have failed to pay and

5

refused to pay the amounts due." Compl. ¶ 15, ECF No. 1. Plaintiff asserted that, because Tramp and the vessel owed Plaintiff "the sum of $809,420.50," Plaintiff had "a maritime lien on the [vessel] for the unpaid balance due of $809,420.50 for necessaries provided to the vessel, pursuant to 46 U.S.C. §§ 31341 and 31342. Id. ¶¶ 19, 20. Along with the Verified Complaint, Plaintiff filed a Motion for Issuance of Warrant of Maritime Arrest, pursuant to Supplemental Admiralty Rule C, for arrest of the vessel, which was expected to arrive in the Eastern District of Virginia within the next fourteen days. ECF No. 3. After reviewing the Verified Complaint and accompanying documents, the Court granted Plaintiff's motion and issued an Order for Issuance of Warrant of Maritime Arrest. ECF No. 4. The vessel was arrested on or about April 8, 2013. On April 10, 2013, the Court entered a joint stipulation filed by Plaintiff and Claimant, agreeing that Plaintiff would release the vessel from arrest in exchange for a cash bond deposited by Claimant with the Court in the amount of $850,000. ECF No. 11.

### C. Procedural History

Plaintiff filed its motion for summary judgment on December 17, 2013, alleging that it is "entitled to a maritime lien on the vessel" and requesting that the Court "allow Plaintiff to execute its maritime lien and collect that sum owed by the Vessel." Pl.'s Mot. Summ. J. at 1, ECF No. 29. On January 15,

2014, Claimant filed a brief opposing Plaintiff's motion, alleging that the Court "lacks subject matter jurisdiction," that "there are genuine issues of material fact regarding the contractual privity between plaintiff and the parties and property," and that Plaintiff "does not have an in rem lien on the narrow facts of this case." Claimant's Br. in Opp'n at 1-2, ECF No. 39. Plaintiff filed its reply brief on February 6, 2014. ECF No. 48.

Claimant filed its cross-motion for summary judgment on March 10, 2014, asserting as grounds for its cross-motion the same grounds it had asserted as defenses to Plaintiff's summary judgment motion. ECF No. 64. Plaintiff filed its brief opposing the cross-motion on March 24, 2014. ECF No. 79. Claimant filed its reply brief on March 31, 2014. ECF No. 87. Accordingly, both motions are ripe for review.

## II. STANDARD OF REVIEW

The Federal Rules of Civil Procedure provide that a district court shall grant summary judgment in favor of a movant if such party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of some alleged factual dispute between the parties "will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."

7

Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247-48 (1986). If the pleadings, affidavits, deposition transcripts, and other discovery materials demonstrate that there is no genuine dispute as to a material fact, "it is the 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" Hostettler v. Auto-Owners Ins. Co., 744 F. Supp. 2d 543, 545 (E.D. Va. 2010) (quoting Drewitt v. Pratt, 999 F.2d 774, 778-79 (4th Cir. 1993)).

If a movant has properly advanced evidence supporting entry of summary judgment, the non-moving party may not rest upon the mere allegations of the pleadings, but instead must set forth specific facts in the form of exhibits and sworn statements illustrating a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). At that point, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. In doing so, the judge must construe the facts and all "justifiable inferences" in the light most favorable to the non-moving party, and the judge may not make credibility determinations. Id. at 255; T-Mobile Ne. LLC v. City Council of Newport News, 674 F.3d 380, 385 (4th Cir. 2012). After viewing the evidence in the non-movant's favor, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other

but whether a fair-minded jury could return a verdict for the [non-movant] on the evidence presented." Anderson, 477 U.S. at 252. Because a ruling on summary judgment "necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits[,] . . . [t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to overcome a defendant's well-founded summary judgment motion. Id. Accordingly, if the non-movant's evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50. When confronted with cross-motions for summary judgment, "the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted).

### III. DISCUSSION

#### A. Claimant's Rule 56(d) Motion

Plaintiff filed its summary judgment motion on December 17, 2013. On January 16, 2014, when Claimant filed its response to Plaintiff's summary judgment motion, Claimant asserted that Plaintiff had "produced a total of 73 pages of documents in discovery and ha[d] objected to numerous discovery requests." Claimant's Br. in Opp'n at 10, ECF No. 39. Claimant observed

that it was "entitled to continue discovery through February 25, 2014," pursuant to the "Rule 16(b) Scheduling Order entered in this case." Id. Claimant, further asserting that several depositions had not yet been completed, requested additional time "for discovery so that the claims and defenses in this action can be disposed of on the merits." Id. at 11.

The Court observes that the date for the completion of discovery has since passed and Claimant has filed its own motion for summary judgment, accompanied by sworn declarations, excerpts from depositions, and copies of Plaintiff's responses to Claimant's discovery requests. ECF No. 64. In addition, both the Magistrate Judge assigned to this case and this Judge have addressed several issues regarding proposed amendments to certain filings in this case. Furthermore, Claimant makes no assertion in its own cross-motion for summary judgment that any discovery is still yet to be completed. Accordingly, having received no indication that the parties have failed to comply with the Rule 16(b) Scheduling Order in this case, or their obligation to work together to prepare this case for trial, the Court **DISMISSES AS MOOT** Claimant's Rule 56(d) motion seeking additional time to complete discovery.

## B. Summary Judgment Motions

Plaintiff asserts that it is entitled to summary judgment because the undisputed facts establish that 1) the vessel,

10

through time-charterer Tramp, entered into an agreement to purchase fuel bunkers from Plaintiff, 2) the agreement, through incorporation by reference of Plaintiff's terms and conditions located on its website, "contains an explicit choice of law provision selecting United States law," and 3) Plaintiff is entitled to a maritime lien against the vessel under "the Federal Maritime Lien Act" ("FMLA"), which "provides liens by bunker suppliers against a vessel." Pl.'s Br. Supp. Summ. J. at 7-10, ECF No. 30. Claimant disagrees, asserting that it is entitled to summary judgment because 1) neither Plaintiff, Claimant, nor the vessel were parties to the agreement, 2) the agreement is not governed by United States law, and 3) even if the agreement is governed by United States law, the general maritime law of the United States referenced in the General Terms does not include maritime statutes such as the FMLA. Furthermore, Claimant alleges, 4) because Plaintiff had actual notice of its anti-lien agreement with Tramp, Plaintiff is not entitled to a maritime lien, regardless of which country's law governs the agreement. Because the grounds for Claimant's cross-motion for summary judgment are the same as its defenses to Plaintiff's motion for summary judgment, and because the Court grants Plaintiff's motion and denies Claimant's cross-motion, the Court is required to "'resolve all factual disputes and any competing, rational inferences in the light most

favorable' to [Claimant,] the party opposing [Plaintiff's] motion." Rossignol, 100 F.3d at 523 (quoting Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996)).

### 1. Law Governing Contract Formation

Claimant asserts that, before determining the validity of the choice-of-law provision located in the General Terms, "the Court must first evaluate whether the contractual provision providing for the application of U.S. law is valid under the law of the country in which the contract was formed." Claimant's Br. Supp. Summ. J. at 24-25, ECF No. 66. Claimant further contends that the contract formation issues in this case are governed by Greek law because the parties' dispute involves "a contract made in Greece between two Greek parties for delivery of bunkers to a foreign (non U.S.) vessel, in a foreign (non U.S.) port, by a foreign (non U.S.) supplier." Id. at 22 (applying Lauritzen factors). Claimant also offers the sworn declaration of Andreas Nassikas, a Greek attorney experienced in "the areas of shipping and insurance law," who asserts that "Greek law applies to the formation of the contract for the provision of bunkers in this case since Greece is most closely connected with the surrounding circumstances." Nassikas Decl.

at 2, 10, ECF Nos. 39-4, 66-19.[1] Specifically, Mr. Nassikas observes that Tramp "is a company . . . in Greece, the negotiations . . . were conducted in Greece (between Bunkerfuels Hellas and [Tramp]), and the parties have entered into the contract in Greece." Id. Plaintiff responds that, even if "Greek law govern[s] the formation of the contract, Plaintiff's lien still exists." Pl.'s Br. in Opp'n at 13, ECF No. 79.

The United States Court of Appeals for the Fourth Circuit has recognized that, "absent compelling reasons of public policy, a choice-of-law provision in a maritime contract should be enforced." Triton Marine Fuels Ltd., S.A. v. M/V PACIFIC CHUKOTKA, 575 F.3d 409, 415 (4th Cir. 2009) (citing M/S BREMEN v. Zapata Off-Shore Co., 407 U.S. 1, 12-13 (1972); Lauritzen v. Larsen, 345 U.S. 571, 588-89 (1953); Bominflot, Inc. v. M/V HENRICH S, 465 F.3d 144, 148 (4th Cir. 2006); Hawkspere Shipping Co. v. Intamex, S.A., 330 F.3d 225, 233 (4th Cir. 2003)). However, where a choice-of-law provision does not appear on the face of the contract, as in Triton where the bunker confirmation contained a United States choice-of-law provision, but rather in a document incorporated by reference into the contract, as in

---

[1] Rule 44.1 of the Federal Rules of Civil Procedure provides: When "determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." A party's rights under foreign law may "be proved in several different ways, such as through an affidavit by a foreign legal expert or through an authoritative legal treatise or law review article." 1 Thomas J. Schoenbaum, Admiralty & Mar. Law § 9-8, at 737 n.26 (5th ed. 2011).

this case where the bunker confirmation incorporated by reference terms and conditions containing a United States choice-of-law provision, prudence requires the Court to first determine "which country's law controls the issue of contract formation." Trans-Tec Asia v. M/V Harmony Container, 518 F.3d 1120, 1124 (9th Cir. 2008) (first conducting analysis to determine "which country's law controls the issue of contract formation" where bunker confirmation incorporated by reference a United States choice-of-law provision in terms and conditions). In other words, before the Court "can determine the validity of the United States choice of law provision in the contract between [Plaintiff] and [Claimant]," it must first determine, "as a matter of law, that such a provision was a valid contractual term and was legitimately incorporated into the parties' contract." Id. (emphasis added) (cited with approval in Triton, 575 F.3d at 415); see also Oceanconnect.com, Inc. v. M/V FESCO ANGARA, No. 2:09-1694, 2012 U.S. Dist. LEXIS 125241, at **12-13 (W.D. La. Aug. 31, 2012).

Generally, in order to determine which country's law to apply to a certain issue, "federal courts sitting in admiralty [should] apply maritime choice-of-law principles derived from the [United States] Supreme Court's decision in Lauritzen." Trans-Tec Asia, 518 F.3d at 1124. Under Lauritzen, a court should consider "(1) the place of the wrongful act; (2) the law

14

of the flag; (3) the allegiance of the injured party; (4) the allegiance of the defendant shipowner; (5) the place of contract; (6) the inaccessibility of a foreign forum; and (7) the law of the forum." Id. (citing Lauritzen, 345 U.S. at 583-92). In this case, however, Claimant proffers its own analysis of the Lauritzen factors, concluding that Greek law governs the contract formation issues, and Plaintiff does not strongly disagree. See Pl.'s Reply Br. at 6, ECF No. 48; Pl.'s Br. in Opp'n at 13, ECF No. 79 (observing that, "[e]ven if the Court were to . . . ignore the other possible countries' law, conclude there was an actual conflict, and conclude that Greek law governed the formation of the contract, Plaintiff's lien still exists"). The Court acknowledges that it is at least conceivable that the law of the United Arab Emirates (where Plaintiff is located), China (where Claimant is located), or Hong Kong (where the vessel is flagged), might govern the formation of the contract, rather than Greece. See, e.g., Trans-Tec Asia, 518 F.3d at 1125 (observing that determining the "place of contract or . . . negotiation of the contact" is a "thorny inquiry" and, under the particular facts of that case, the vessel's "Malaysian flag and [the vessel owner's] Malaysian nationality" outweighed the place of the contract, which was "formed through a series of emails and facsimiles" between Singapore and Taiwan "when the [vessel] was docked in Hong Kong"

(applying Lauritzen factors)). However, the Court also recognizes that it must "'resolve all factual disputes and any competing, rational inferences in the light most favorable' to [Claimant,] the party opposing [Plaintiff's] motion." Rossignol, 100 F.3d at 523. Because Claimant makes a compelling argument that Greek law governs the formation of the contract in this case, because Plaintiff does not suggest the outcome under Greek law would be any different, and because the Court knows of no "public policy" forbidding the application of Greek law, Lauritzen, 345 U.S. at 588, the Court applies Greek law to resolve the issues regarding the formation of the contract.[2]

## 2. Parties to the Contract

Claimant argues that Plaintiff, because it "neither arranged nor performed any contract," was not "in privity of contract with any other party to the transaction" between Tramp and Bunkerfuels Hellas "under either Greek or U.S. law." Claimant's Br. Supp. Summ. J. at 2, 9, ECF No. 69. Plaintiff disagrees, arguing that the undisputed evidence shows that Plaintiff was the "seller" and that Vogas, an employee of Bunkerfuels Hellas, simply "serve[d] as broker on behalf of

---

[2] Even if the Court were to alternatively apply the Triton standard, skip the Lauritzen analysis, and conclude that the United States choice-of-law provision controlled, as explained below, the Court would reach the same ultimate conclusion as it does when applying Greek law as to the formation of the contract.

Plaintiff" to arrange the transaction between Tramp and Plaintiff. Pl.'s Br. in Opp'n at 3, ECF No. 79.

Under Greek law, a principal may "knowingly allow[] the [agent] to contract with third parties as if he were the [principal's] agent or representative." Nassikas Decl. at 7, ECF Nos. 39-4, 66-19. Furthermore, if an agent "alleges that he is transacting business on the [principal's] behalf and the [principal], although aware of the [agent's] conduct, takes no steps to put a stop to it, this suffices very much for the [Greek] doctrine of ostensible authority to apply." Id. The Greek doctrine of "ostensible authority" is much like the agency law recognized in the United States, where "[t]he essential underlying principle in the agency relationship is the power of an agent to commit his principal to business relations with third parties." Allianz Ins. Co. v. Cho Yang Shipping Co., Ltd., 131 F. Supp. 2d 787, 792 n.1 (E.D. Va. 2000) (citing Griffin v. United States, 588 F.2d 521, 528-29 (5th Cir. 1979)). For example, United States agency law recognizes that "[a]n agent can have actual authority, meaning explicit permission from the principal to act on its behalf." Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading, Inc., 697 F.3d 59, 71 (2d Cir. 2012) (citing Interocean Shipping Co. v. Nat'l Shipping & Trading Co., 523 F.2d 527, 537 (2d Cir. 1975); Restatement (Third) of Agency § 2.01 (2006)). This Greek law principle

17

finds further application in United States law recognizing that an agent can also have "apparent authority, by which the agent can 'affect [the] principal's legal relations with [a] third part[y] when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Id. (quoting Restatement (Third) of Agency § 2.01 (2006)). Furthermore, in the United States, "the existence and scope of an agency relationship can be resolved as a matter of law . . . if: (1) the facts are undisputed; or (2) there is but one way for a reasonable jury to interpret them." Garanti, 697 F.3d at 71-72 (citing Brunswick Leasing Corp. v. Wisc. Cent., Ltd., 136 F.3d 521, 526 (7th Cir. 1998).

Plaintiff's Verified Complaint[3] asserts that Plaintiff "entered an agreement with the [vessel] and Tramp Maritime to provide bunkers and marine gas oil to the [vessel]." Compl. ¶ 8, ECF No. 1. Attached to the Verified Complaint is a copy of the bunker confirmation, indicating the seller as "BUNKERFUELS A DBA/DIVISION of WFS Trading DMCC." Compl. Ex. 3, ECF No. 1-3. Plaintiff also submits the sworn declaration of Jos Heijmen,

---

[3] Because Plaintiff's Complaint contains a sworn declaration "based upon [the] personal knowledge and documents available to [the affiant]," ECF No. 1 at 6, the Verified Complaint may be considered for purposes of summary judgment just as any other sworn declaration submitted for summary judgment purposes. See Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991); see also Williams v. Adams, 935 F.2d 960, 961 (8th Cir. 1991) ("A verified complaint is the equivalent of an affidavit for summary-judgment purposes.").

"Senior Vice President of Credit & Risk Management of [WFS Corp.]," affirming that Bunkerfuels Hellas is "affiliated" with WFS DMCC, and acts as a local "point of contact" for "Greek ship operators/owners, . . . regardless of where a ship is located in the world." Heijmen Decl. ¶¶ 8-9, ECF No. 48-2. According to Mr. Heijmen, Bunkerfuels Hellas, upon receiving the inquiry for fuel to be delivered in Khor Fakkan, United Arab Emirates, "relayed [the inquiry] to the World Fuel's affiliated company located in the geographic region of the world where the bunkers will be delivered" - WFS DMCC. Id. at ¶ 10. After WFS DMCC authorized Vogas, an employee of Bunkerfuels Hellas, "to act and enter on [its] behalf . . . the contract with Tramp," id. at ¶ 13, Vogas sent the bunker confirmation, on behalf of Plaintiff, to Tramp, listing the seller as "BUNKERFUELS A DBA/DIVISION OF WFS Trading DMCC," Compl. Ex. 3 at 1, ECF No. 1-3.

In its opposition to Plaintiff's summary judgment motion, Claimant presents no "specific facts," supported by "depositions, answers to interrogatories, [or] admissions on file," illustrating "that there is a genuine issue for trial," Celotex, 477 U.S. at 324, as to whether Plaintiff was a party to the contract. Claimant's own cross-motion for summary judgment, filed after the deadline for completing discovery had passed, fails to establish a genuine issue for trial regarding

19

Plaintiff's privity to the contract. Rather, Claimant merely alleges that no evidence "identif[ies] [Plaintiff] as 'Bunkerfuels'" as indicated on the bunker confirmation, or "establish[es] any organizational relationship between Bunkerfuels Hellas and [WFS] DMCC." Claimant's Br. Supp. Summ. J. at 10, ECF No. 66. Claimant also points to an invoice from APSCO to "Marine Energy Arabia, LLC," another one of WFS Corp.'s "Marine Group of companies," for the bunkers delivered to the vessel in this case, as well as payment sent by WFS Corp., Plaintiff's parent corporation, to APSCO for the bunkers, see ECF Nos. 66-8, 66-11, in support of its argument that Plaintiff's "only connection" to the transaction is the bunker confirmation's statement: "SELLER: BUNKERFUELS A DBA/DIVISION OF WFS Trading DMCC." Claimant's Br. Supp. Summ. J. at 13, ECF No. 66.

The Court finds Claimant's allegations of a lack of privity between Plaintiff and Tramp insufficient to create a genuine issue of material fact. Anderson, 477 U.S. at 252. Heijmen's sworn declaration establishes that Bunkerfuels Hellas had "explicit permission from the principal to act on its behalf." Garanti, 697 F.3d at 71. Vogas, employed by Bunkerfuels Hellas, exercised his ostensible authority "to act and enter on [Plaintiff's] behalf . . . the contract with Tramp," Heijmen Decl. ¶ 13, ECF No. 48-2, and accurately represented Plaintiff

20

as the seller on the bunker confirmation sent to Tramp, Compl. Ex. 3, ECF No. 1-3. Payment by Plaintiff's parent corporation to APSCO for delivery of the bunkers, as well as invoicing by APSCO to Marine Energy Arabia, LLC for the bunkers APSCO delivered to the vessel, does not create a genuine issue of material fact as to whether Plaintiff was a party to the contract, but merely suggests that other entities besides Plaintiff handled the billing and receipts related to the purchase and delivery of the bunkers. Because "there is but one way for a reasonable jury to interpret" the facts as presented by Plaintiff regarding the agency relationship between itself and Bunkerfuels Hellas, Garanti, 697 F.3d at 71-72, and because Claimant offers no specific facts illustrating otherwise, the Court finds that Plaintiff has satisfied its burden as a matter of law regarding its privity to the contract with Tramp.

### 3. Incorporation by Reference of the General Terms

Claimant also argues that the bunker confirmation failed to incorporate by reference Plaintiff's General Terms located on WFS Corp.'s website because Tramp neither had reasonable notice of Plaintiff's General Terms nor manifested its assent to the General Terms. Specifically, Claimant contends that, under Greek law, the General Terms were not validly incorporated into the bunker confirmation because they were not located at the exact website address indicated on the bunker confirmation and,

in any event, the General Terms failed to name Plaintiff as a company covered by such General Terms. Plaintiff disagrees, arguing that 1) Claimant's own evidence establishes that "Greek law [does not] prohibit[] incorporation of contract terms by reference to an additional document," 2) the requirement of "two additional clicks" to reach the General Terms on WFS Corp.'s website did not deprive Tramp of "reasonable notice of the [General Terms]," and 3) "the very language of the [General] Terms" indicates that the list of companies is "not intended to be exhaustive." Pl.'s Br. in Opp'n at 5, 7, 12, ECF No. 79.

According to the sworn declaration of Mr. Nassikas, submitted by Claimant, "Greek law will respect any choice of law made by the parties to the contract, provided such choice is either made expressly or can be clearly ascertained by interpreting their agreement." Nassikas Decl. at 9, ECF Nos. 39-4, 66-19 (citing European Union (EU) Regulation No. 593/2008, Art. 3(1)). Mr. Nassikas further asserts that, under Greek law, "a U.S. choice of law term [would] be valid if it was expressly stated on the face of a contract," but in order for "such a term [to] be incorporated by reference to a website," the "reference to [the] website" should be drafted in "a clear, plain and explicit way." Id. at 10-11. In response, Plaintiff offers the sworn declaration of Paris Karamitsios, a Greek attorney specializing in "shipping and transportation law." Karamitsios

22

Decl. at 1, ECF No. 48-1. Mr. Karamitsios asserts that, under Greek law, "in order for general terms and conditions to apply to the contract, [Tramp] must have obtained knowledge of the contents of such terms or must have been given the opportunity to obtain knowledge thereof." Id. at 5 (citing, inter alia, the United Nations Convention on Contracts for the International Sale of Goods Arts. 8, 14-24 (Vienna, 1980), which was "ratified by Greece by way of law 2532/1997").

It is undisputed that the actual website address of the General Terms is www.wfscorp.com/Marine/pdf/Marine-Terms.pdf and that a person must click two additional links to reach the General Terms from WFS Corp.'s home page at www.wfscorp.com. In addition, the bunker confirmation expressly directs the recipient to "inform us if you require a copy [of the General Terms] and same will be provided to you." Compl. Ex. 3, ECF No. 1-3. The Court finds that the bunker confirmation validly incorporated the General Terms under both of the Greek standards asserted by Claimant and Plaintiff. Mr. Nassikas opined that the reference to the General Terms located at www.wfscorp.com "lacks, per se, the necessary clarity and explicitly [sic]," because the "term cannot immediately be found" at the website address provided on the bunker confirmation. Nassikas Decl. at 11, ECF Nos. 39-4, 66-19. However, the Court disagrees with Mr. Nassikas's opinion and finds that the bunker confirmation was

23

sufficiently clear and explicit to direct Tramp - as well as anyone else who received the bunker confirmation - to the General Terms. See, e.g., One Beacon Ins. Co. v. Crowley Marine Servs., 648 F.3d 258, 263, 169 (5th Cir. 2011) (approving similar incorporation by reference of terms and conditions located on a website requiring four clicks to reach the actual location of the terms, noting that although the confirmation "undoubtedly could have provided clearer direction to the location of the terms and conditions on the website, . . . notice of the terms and conditions was reasonable under the particular facts of this case"). Furthermore, the bunker confirmation in this case explicitly offered Tramp "the opportunity to obtain knowledge" of the General Terms, Karamitsios Decl. at 1, ECF No. 48-1, by offering to provide a copy of the General Terms upon request. Accordingly, the Court finds no genuine issue of material fact regarding whether, under Greek law, the General Terms were validly incorporated by reference into the bunker confirmation.

### 4. Companies Covered by General Terms

Claimant argues that, because the General Terms do not specifically identify Plaintiff as an entity covered by the General Terms, such General Terms "are not Plaintiff's terms and conditions." Claimant's Br. Supp. Summ. J. at 15, ECF No. 66. Plaintiff disagrees, arguing that the list of entities contained

24

in the General Terms is "not intended to be exhaustive." Pl.'s Br. in Opp'n at 5, ECF No. 79.

Plaintiff submitted a copy of the General Terms located at WFS Corp.'s website. Compl. Ex. 5, ECF No. 1-5. Although it is true that the General Terms do not specifically name Plaintiff as one of the "Marine Group of companies," the General Terms specify that the "Marine Group of companies . . . includes, but is not limited to" the named companies – of which WFS Corp. is one – "and their respective trade names, subsidiaries, affiliates and branch offices." Id. (emphases added). The undisputed evidence shows that Plaintiff is a subsidiary of WFS Corp. Furthermore, the General Terms cover "all subsidiaries of [WFS Corp.] who have sold, are selling or will sell marine petroleum products and services, whether or not in existence on the effective date." Id. (emphasis added). Thus, it is clear that the General Terms apply to Plaintiff, a subsidiary of WFS Corp. and a seller of marine petroleum products and services. In any event, the bunker confirmation directs the reader to the General Terms, and this indicates that Plaintiff had adopted those terms as its own, regardless of whether Plaintiff was identified by name in the General Terms. Accordingly, the Court finds no genuine issue of material fact regarding whether the General Terms located on WFS Corp.'s website applied to Plaintiff and the agreement between Plaintiff and Tramp.

### 5. The "General Maritime Law of the United States"

Claimant next argues that, even if the General Terms were validly incorporated by reference into the bunker confirmation, the choice-of-law provision limits the governing law to "the General Maritime Law of the United States," which Claimant asserts does not include United States maritime statutes, such as 46 U.S.C. §§ 31341 and 31342, under which Plaintiff brings this action. Claimant's Br. in Opp'n at 14-15, ECF No. 39; see also Claimant's Br. Supp. Summ. J. at 21 n.7, ECF No. 66 (incorporating by reference Claimant's argument in its brief opposing Plaintiff's motion for summary judgment). Plaintiff disagrees, asserting that "the phrase general maritime law simply indicates that it is the maritime statutes and case law that are applicable." Pl.'s Reply Br. at 3 n.2, ECF No. 48. Plaintiff contends that, because the parties "agreed that U.S. law should govern the transaction," "this Court must apply 46 U.S.C. § 31342." Id. at 3. However, Claimant points out that Plaintiff did not choose United States statutory law to govern the agreement with Tramp - it chose "only 'the general maritime law of the United States,' and not the entirety of U.S. law." Claimant's Br. in Opp'n at 15, ECF No. 39.

The general maritime law "stems from the maritime jurisprudence of the federal courts" and "'is an amalgam of traditional common law rules, modifications of those rules, and

26

newly created rules.'" 1 Thomas J. Schoenbaum, <u>Admiralty & Mar.</u> <u>Law</u> § 5-1, at 248 (5th ed. 2011) (quoting <u>E. River Steamship</u> <u>Corp. v. Transam. Delaval, Inc.</u>, 476 U.S. 858, 864-65 (1986)). "The general maritime law of contracts covers contracts such as charter parties, salvage contracts, tug and tow, repair contracts, insurance, and other agreements not addressed by statutes." <u>Id.</u> at 249. "Until 1910, the lien law of the United States was composed of state law and the general maritime law under federal jurisdiction." William Tetley, <u>Mar. Liens &</u> <u>Claims</u> 40 (2d ed. 1998); <u>see also</u> <u>Triton</u>, 575 F.3d at 417 (explaining that, "[p]rior to 1910, a maritime lien arose under United States law when necessaries were provided to a vessel in a port of a foreign country or state, but no such lien arose . . . in a port of the vessel's home state, unless a lien was authorized by local state law"). "Since then, legislation has been passed in order to codify and clarify federal lien . . . law, without . . . abolishing the general `maritime law <u>which is</u> <u>not incompatible with the statutory law</u>." Tetley, <u>supra</u>, at 40 (emphasis added).

"[L]egislation has always served as an important source of both common law and admiralty principles." <u>Miles v. Apex Marine</u> <u>Corp.</u>, 498 U.S. 19, 24 (1990). As a general rule, "[s]tatutes which invade the common law or the general maritime law are to be read with a presumption favoring the retention of long-

established and familiar principles, except when a statutory purpose to the contrary is evident." Isbrandtsen Co. v. Johnson, 343 U.S. 779, 783 (1952). When determining Congress's purpose in enacting – or amending – a particular statute, the "statutory text" is the "best evidence" of what Congress "set[] out to change, but also what it resolve[d] to leave alone." W. Va. Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 98 (1991).

"[A]n admiralty court must be vigilant not to overstep the well-considered boundaries imposed by federal legislation." Miles, 498 U.S. at 27. To be sure, "it is for Congress, not federal courts, to articulate the appropriate standards to be applied as a matter of federal law." Milwaukee v. Illinois, 451 U.S. 304, 316-17 (1981) (internal quotation marks omitted). Consequently, when a statute "'speak[s] directly to a question, the courts are not free to supplement Congress' answer so thoroughly that the [statute] becomes meaningless.'" Miles, 498 U.S. at 31 (quoting Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 625 (1978)). Put another way, "when a statute resolves a particular issue, . . . the general maritime law must comply with that resolution." Norfolk Shipbuilding & Drydock Corp. v. Garris, 532 U.S. 811, 817 (2001).

Before Congress enacted the Federal Maritime Lien Act of 1910, "[t]he state of the general maritime law on the imposition of contract liens on chartered vessels was conveniently summed

28

up in two [United States Supreme Court] cases," The Kate, 164 U.S. 458 (1896), and The Valencia, 165 U.S. 254 (1897). G. Gilmore & C. Black, The Law of Admiralty § 9-40, at 670 (2d ed. 1975). "Taken together, The Kate and The Valencia established the following propositions:"

> 1) when a materialman either knows or could easily find out that a ship is under charter (The Kate) or, preferring ignorance to knowledge, "shuts his eyes" to obvious facts (The Valencia), he is put on inquiry as to what the charter contains;
> 2) a charter party term requiring the charterer to "provide and pay for" certain services is enough to defeat a lien for such services in favor of a materialman who was on inquiry as to what the charter party contained.

Id. at 672. In enacting the Federal Maritime Lien Act of 1910, Congress purported to make "'no change in the general principles of the [then] present law of maritime liens.'" Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co., 254 U.S. 1, 11-12 (1920). Rather, Congress intended "to simplify and clarify the rules [concerning] maritime liens as to which there had been much confusion," to abolish "the artificial distinction between repairs, supplies, etc., furnished in home ports and those furnished in foreign ports," and to "substitute[] a federal statute for numerous state statutes purporting to confer liens." Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., 310 U.S. 268, 272 (1940). Thus, consistent with the general maritime law, the Federal Maritime Lien Act of 1910 conferred no

lien "'when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, . . . the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor.'" Id. at 273 (quoting former 46 U.S.C. § 973).[4]

In 1971, however, Congress abolished the general maritime duty of a supplier, imposed under The Kate and The Valencia and preserved in the Federal Maritime Lien Acts of 1910 and 1920, to "inquire as to the presence and terms of a charter party." 2 Benedict on Admiralty § 40, at 3-42 (7th ed. 1998). Thus, under the current federal statute governing maritime liens,

> even if [a supplier] is aware that the vessel with which he is dealing is under charter, he should not be charged with knowledge of the existence of any "no lien" clause absent affirmative evidence that he had received express notice from the owner or other reliable source that the vessel was not to be bound.

Id. (emphasis added); see also Ramsay Scarlett & Co. v. S. S. Koh Eun, 462 F. Supp. 277, 285 (E.D. Va. 1978) (describing "the post-1971 . . . statutory presumption" as rendering a prohibition of lien clause "ineffective against such a supplier of necessaries absent actual knowledge of a charter including a prohibition of lien clause" (emphasis added)). Indeed, in

---

[4] The Federal Maritime Lien Act of 1910 was "subsequently amended in 1920 to cure an overly restrictive interpretation." 2 Benedict on Admiralty § 37, at 3-22 (7th ed. 1998) (citations omitted). "American federal maritime lien and mortgage law is now codified in the Commercial Instruments and Maritime Liens Act," ("CIMLA") at 46 U.S.C. §§ 31301-09, 31321-30, 31341-43. Tetley, supra, at 41 and n.206.

actions pursued solely under the current federal statute, it has been said that "The Kate and The Valencia are therefore without application, further than they purport to state [pre-statutory] general maritime law." The South Coast, 247 F. 84, 89-90 (9th Cir. 1917).

Of course, pre-1971 general maritime "principles are still important and in some situations are still controlling because the Federal Maritime Lien Act does not regulate the entire subject of maritime liens." 2 Benedict, supra § 36, at 3-22 (citing 46 U.S.C. § 31342). However, the 1971 deletion of the duty-of-inquiry "statutory text" from the Federal Maritime Lien Act, Casey, 499 U.S. at 98, clearly evidences Congress's intent to "speak directly to [the] question," Miles, 498 U.S. at 31, of whether a supplier of necessaries has a duty to inquire as to the presence and terms of a charter party. Indeed, Claimant appears to concede that "the general maritime law . . . relating to vessel liens for necessaries . . . was fully preempted by the drastic departure from the general maritime law resulting from the 1971 amendment." Claimant's Reply Br. at 10, ECF No. 87 (contending that, as a result of the statutory preemption of the general maritime law, "Plaintiff's selection of the 'General Maritime Law of the United States' - without more - affords it no remedy"). Because "the general maritime law must comply with [Congress's] resolution" of this "particular issue," Garris, 532

31

U.S. at 817 (emphasis added), the Court finds that "the General Maritime Law of the United States," Compl. Ex. 5, ECF No. 1-5, includes the Federal Maritime Lien Act, pursuant to which Plaintiff brings this action. See In re Eagle Geophysical, Inc., 2001 AMC 1808, 1813 n.14 (D. Del. 2001) (observing that "[i]t would undermine the FMLA to conclude that, even in the absence of satisfying the requirements of the FMLA, any party who provides a 'necessity' to a vessel is entitled to a maritime lien under general maritime principles").

### 6. Existence of a Maritime Lien under 46 U.S.C. §§ 31341-42

Plaintiff alleges that it is entitled to a maritime lien under 46 U.S.C. §§ 31341 and 31342 because 1) Tramp had the "presumed authority to bind the vessel" when it ordered necessaries for the vessel, 2) Plaintiff "supplied the fuel" to the vessel, and 3) "no facts support that [Plaintiff] had actual knowledge" of the "prohibition of lien clause" in Tramp's charter party." Pl's Br. Supp. Summ. J. at 10-11, ECF No. 30. Claimant argues that, assuming the transaction was governed by United States statutory law, the two no-lien stamps provided to Plaintiff under Tramp's earlier charter party "gave actual notice that a maritime lien claim for bunkers was beyond [Tramp's] actual or apparent authority." Claimant's Br. in Opp'n at 21-22, ECF No. 39; Claimant's Br. Supp. Summ. J. at 68-69, ECF No. 66.

"[U]nder American law, a [maritime] lien arises to secure creditors who provide 'necessaries' - 'supplies, repairs and equipment . . . ordered on the credit of the ship and which are generally beneficial to the ship.'" Marine Oil Trading Ltd. v. Motor Tanker Paros, 287 F. Supp. 2d 638, 640-41 (E.D. Va. 2003) (quoting Tetley, supra, at 551); see also 46 U.S.C. § 31342 (granting a maritime lien to a person "providing necessaries to a vessel"). "In the case of a maritime lien, the vessel itself is viewed as the obligor, regardless of whether the vessel's owner is also obligated." Triton, 575 F.3d at 413-14. "It is a fundamental tenet of maritime law that '[c]harterers and their agents are presumed to have authority to bind the vessel by the ordering of necessaries.'" Id. at 414 (quoting Trans-Tec Asia, 518 F.3d at 1127-28); see also 46 U.S.C. § 31341. "The § 31341 presumptions are of immense value to the supplier" because the supplier need not "know anything about the authority of the manager of the ship beyond the fact that such individual apparently exercises that degree of control over the vessel that could be expected of any [entrusted] agent of the owner." 2 Benedict, supra, § 40, at 3-41.

A maritime lien does not arise, however, "when necessaries are ordered by one without authority to bind the vessel" where the vessel owner can "'show that the supplier of necessaries had actual knowledge of the existence of any lack of authority

33

relied upon as a defense.'" Belcher Oil Co. v. M/V GARDENIA, 766 F.2d 1508, 1512 (11th Cir. 1985) (quoting Jan C. Uiterwyk Co., Inc. v. M/V HARE ARABICO, 459 F. Supp. 1325, 1331 (D. Md. 1978)). Because "[a]ctual knowledge of [a] prohibition of lien clause is merely one way of obtaining actual knowledge of one's lack of authority to bind a vessel," a vessel owner may rebut the presumption of a charterer's authority to bind the vessel by establishing "that the supplier of necessaries either had actual knowledge that the person ordering the supplies lacked the authority to bind the vessel or had knowledge of a prohibition of lien clause in the charter." Id. at 1512-13. Such actual knowledge "defeats a maritime lien because 'the supplier is then in a position to make an informed business decision, and may refuse to supply the vessel, make other arrangements for payment, or assume the risk.'" Am. Oil Trading, Inc. v. M/V SAVA, 47 F. Supp. 2d 348, 352 (E.D. N.Y. 1999) (quoting Gulf Oil Trading Co. v. M/V CARIBE MAR, 757 F.2d 743, 749 (5th Cir. 1985)). Consequently, actual knowledge must be attributed to an employee of the supplier "who has the ability to effect the negotiations and the contract prior to the time the contract is entered into." O.W. Bunker Malta Ltd. v. M/V TROGIR, No. CV12-05657R, 2013 U.S. Dist. LEXIS 19026, at *7 (W.D. Cal. Jan. 29, 2013). "The party seeking to bar a supplier's maritime lien has the burden of proving that the supplier actually knew of a no

34

lien clause in the charter party or other contract," Am. Oil Trading, 47 F. Supp. 2d at 352, or "the existence of any lack of authority relied upon as a defense," Belcher Oil, 766 F.2d at 1512.

The parties do not dispute that the Federal Maritime Lien Act "presum[es] that a charterer is authorized to procure necessaries for the ship." Claimant's Br. in Opp'n at 22, ECF No. 39. Nor is there any dispute that the fuel bunkers qualified as necessaries under the statute, see Marine Oil Trading, 287 F. Supp. 2d at 641 (observing that "[n]ecessaries include fuel bunkers"), or that the fuel bunkers were delivered to the vessel as agreed. Rather, whether Plaintiff is entitled to a maritime lien in this case depends solely on whether or not Plaintiff, with sufficient opportunity to make an informed business decision, received "actual notice that a maritime lien claim for bunkers was beyond [Tramp's] actual or apparent authority." Claimant's Br. in Opp'n at 21-22, ECF No. 39; Claimant's Br. Supp. Summ. J. at 68-69, ECF No. 66.

Here, Claimant fails to show that there is a genuine issue of material fact as to whether Plaintiff "actually knew of a no lien clause in the charter party or other contract." Am. Oil Trading, 47 F. Supp. 2d at 352. Claimant submits copies of two no-lien stamps affixed to two bunker delivery notes provided by the vessel under Tramp's earlier charter party, but provides no

specific facts establishing a genuine issue of material fact regarding whether Plaintiff received actual notice of the no-lien provisions in the charter party governing this transaction. See, e.g., O.W. Bunker Malta, 2013 U.S. Dist. LEXIS 19026, at *7 (granting summary judgment where Claimant "presented no evidence that Plaintiff's employees, outside of the accounting department, actually read the anti-lien stamps on the bunker delivery receipts or had actual knowledge of it"). Even if Plaintiff did receive actual notice of the no-lien provision in the earlier charter party, such notice would charge Plaintiff, at most, with constructive knowledge that Tramp might have lacked the authority to bind the vessel in this transaction. See Lake Union Drydock Co. v. M/V POLAR VIKING, 446 F. Supp. 1286, 1290-91 (W.D. Wash. 1978) (observing that, under the general maritime law and pre-1971 statutory law, "the Supreme Court imputed . . . constructive knowledge of the charter and its terms," based on a supplier's "duty to inquire with 'reasonable diligence," but that the current statute now requires "actual knowledge that the vessel is operating under a charter which contains a no-lien provision" (emphasis in original)). Finally, in response to Claimant's suggestion that, upon "learn[ing] of the no lien provision in the charter after the bunkers were delivered," the fuel bunker supplier "was entitled to exercise self-help to recover the bunkers already

36

delivered," Claimant's Br. in Opp'n at 23-24, ECF No. 39, the Court observes that "actual notice to a supplier is ordinarily ineffective to bar a maritime lien if it is given after the necessaries have been provided to the vessel," Ceres Marine Terms. v. M/V HARMEN OLDENDORFF, 913 F. Supp. 919, 924-25 (D. Md. 1995) (citing M/V CARIBE MAR, 757 F.2d at 749; Gulf Oil Trading Co. v. M/V FREEDOM, 1985 AMC 2738, 2739 (D. Or. 1985); Atl. & Gulf Stevedores, Inc. v. M/V ROSA ROTH, 587 F. Supp. 1033, 1034 (S.D.N.Y. 1984)). Accordingly, the Court finds no genuine issue of material fact regarding the existence of a maritime lien in this matter and finds, as a matter of law, that Plaintiff is entitled to a maritime lien against the vessel.

## IV. CONCLUSION

For the reasons set forth above, Claimant's Rule 56(d) motion for additional time to complete discovery is **DISMISSED AS MOOT**, Claimant's motion for summary judgment is **DENIED**, and Plaintiff's motion for summary judgment is **GRANTED.** The trial scheduled to commence on Tuesday, April 8, 2014, will be limited to the following "triable issues" indicated in the March 27, 2014 final pretrial order: "the total amount due to Plaintiff for which it has a maritime lien on the Vessel," "whether Plaintiff is entitled to prejudgment interest," and "whether Plaintiff is entitled to administrative charges, custodia[] legis expenses, attorney fees and interest." ECF No. 85 at 21;

see Triton Marine Fuels, Ltd. v. M/V PACIFIC CHUKOTKA, 671 F.
Supp. 2d 753, 760 (D. Md. 2009) (citing Bradford Marine, Inc. v.
M/V SEA FALCON, 64 F.3d 585, 589-90) (observing that "an FMLA
lien does not necessarily cover all the terms of the underlying
contract").

    The Clerk is **REQUESTED** to send a copy of this Opinion and
Order to all counsel of record.

    **IT IS SO ORDERED.**

                                           /s/ Mark S. Davis
                                    _____
                                            Mark S. Davis
                                    UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
April  3  , 2014